AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.   MJ21-048 |
| INFORMATION ASSOCIATED WITH THE ACCOUNT INTELLIVISIONINC@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE | ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A-1, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-1, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates |
| 18 U.S.C. §§ 1960, 1956 | Money Laundering, Operating an Unlicensed Money Transmission Business |

The application is based on these facts:

✓  See Affidavit of Special Agent Victor Morales, continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: [x] by reliable electronic means; or: [ ] telephonically recorded.

_____
*Applicant's signature*

Victor Morales, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  January 26, 2021

_____
*Judge's signature*

City and state:  Seattle, Washington

Hon. Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

USAO: 2018R00575

# AFFIDAVIT OF VICTOR MORALES

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

I, VICTOR MORALES, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"). As a Special Agent, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801, *et seq*., and other violations of federal law.  I have been in law enforcement for twelve years.  I have been a Special Agent with the DEA for the past four years.  I have received narcotics enforcement training over the course of seventeen weeks at the DEA Basic Agent Training academy in Quantico, Virginia.

2.      Throughout my career, I have conducted numerous narcotics investigations, including those leading to arrest and prosecution.  From these experiences, I have become familiar with common slang terms and codes used by drug traffickers and their associates to refer to drugs, money, guns, vehicles, compartments, and other things related to their drug trafficking.  I have learned how they attempt to thwart law enforcement by using code terms, multiple cell phones, concealed compartments, "stash houses," and other means.  I have become familiar with the ways in which drugs commonly are transported, stored, and sold, and also how members of a conspiracy communicate with each other.  I am also familiar with common ways in which drug traffickers attempt to profit from their illegal activities, by hiding drug proceeds in various places in order to conceal the illegal source or their ownership, including hiding and transporting bulk cash, sending funds through wire transfers or bank accounts in other persons' names, or investing in assets placed in other persons' names.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.  I have discussed and learned from other law enforcement investigators in regard to these matters, as well.

## PURPOSE OF AFFIDAVIT

4.      I make this affidavit in support of applications for a search warrant for information associated with the following accounts:

      a.      **intellivisioninc@gmail.com** (hereinafter described as the "**SUBJECT ACCOUNT 1**");

      b.      **kenrhule@outlook.com** (hereinafter described as "**SUBJECT ACCOUNT 2**").

collectively, the "**SUBJECT ACCOUNTS**."

5.      The information associated with **SUBJECT ACCOUNT 1** is stored at premises owned, maintained, controlled, or operated by Google, LLC ("Google"), an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, as further described in Attachment A-1, attached hereto and incorporated herein. The information associated with **SUBJECT ACCOUNT 2** is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation ("Microsoft"), an email provider headquartered at 1 Microsoft Way, Redmond, Washington 98052, as further described in Attachment A-2, attached hereto and incorporated herein.

6.      The information to be searched is described in the following paragraphs and in Attachment B.  This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google and Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 and B-2. Upon receipt of the information described in Section I of Attachments B-1 and B-2,

AFFIDAVIT OF SA MORALES - 2
USAO #2018R00575

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2.

7.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the KENNETH J. RHULE, his son KENNETH W. RHULE, and other have committed violations of Title 21, United States Code, Sections 841 and 846 (Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates).  There is also probable cause to believe that KENNETH W. RHULE has committed violations of Title 18, United States Code, Sections 1956 (Money Laundering), and 1960 (Operating an Unlicensed Money Services Business).  There is also probable cause to search the **SUBJECT ACCOUNTS** for information described in Attachments A-1 and A-2 for evidence, fruits, and instrumentalities of these crimes and items to be seized listed in Attachments B-1 and B-2.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I have not included every fact known concerning this investigation.  I have set forth the facts that I believe are necessary for a fair determination of probable cause for the requested search warrant.

9.      This application is being presented by electronic means pursuant to Local Criminal Rule 41(d)(3).

## JURISDICTION

10.     This court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).  Additionally, for **SUBJECT ACCOUNT 2**, the Court "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored."

AFFIDAVIT OF SA MORALES - 3
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**PROBABLE CAUSE**

**I.      Summary of Investigation**

11.      As described herein, KENNETH J. RHULE (hereinafter referred to as "RHULE"), and his son, KENNETH W. RHULE, have been indicted for violating 18 U.S.C. §§ 841, 846 (Conspiring to Manufacture and Distribute Marijuana Distillates and Extracts).  KENNETH W. RHULE has also been indicted for violating 18 U.S.C. § 1960 (Conducting an Unlicensed Money Transmitting Business) and 18 U.S.C. § 1956 (Money Laundering).  Both were arrested in March 2020 and July 2020, respectively.  Since his arrest, KENNETH J. RHULE has remained detained.

12.      RHULE, along with KENNETH W. RHULE, operated the company HerbinArtisans.  From at least 2015 until March 2020, HerbinArtisans manufactured and sold marijuana distillates and extracts, including online through Instagram.  These marijuana distillates and extracts include those referred to as "wax," "shatter," "clear," and marijuana buds, products that contain THC and are marijuana products regulated by the State of Washington.  Despite selling marijuana products, neither RHULE nor HerbinArtisans were listed as applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington.

13.      Additionally, KENNETH W. RHULE sold bitcoins to individuals in exchange for cash without registering with Financial Crimes Enforcement Network ("FinCEN") or the Washington Department of Financial Institutions ("DFI"), in violation of 18 U.S.C. § 1960.  KENNETH W. RHULE, using the moniker Gimacut93, advertised in-person cash-for-bitcoin exchanges on the website localbitcoins.com.  From April 2018 until December 2018, law enforcement, or a cooperating source working with law enforcement, exchanged more than $140,000 in cash for bitcoin with KENNETH W. RHULE or his designee.  When completing these transactions, KENNETH W. RHULE did not ask any "Know Your Customer" information.

**II.     HerbinArtisans**

    **A.  Marijuana Distillation & Extraction**

    14.     Since at least 2015, HerbinArtisans has manufactured and sold marijuana products.  HerbinArtisans maintained an Instagram page dedicated to marketing and selling the HerbinArtisans product—high-grade THC distillates.  The HerbinArtisans page included photos of highly concentrated THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips, diamonds, and other forms of extracts and distillates.

    15.     On January 29, 2020, the HerbinArtisans account had 324 posts, 1,058 followers, and contained the description "PNW Extracts and Distillate[.]  All our own work [.]  Nothing for sale[.]"  Previously, the HerbinArtisans account included the language "DM for inquiries[.]  Bitcoin and Crypto Friendly."  The HerbinArtisans account was created on March 26, 2016, using the registered email address kenny@herbinartisans.com, used by KENNETH W. RHULE.  As of June 12, 2020, the account remained active, but has since been deleted.

    16.     The posts for this account included multiple photographs and videos.  A portion of these photographs are included below:



 **herbinartisans** Some more #goldenticket shatter, who's wants a golden ticket? #herbinartisans

AFFIDAVIT OF SA MORALES - 5
USAO #2018R00575

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



 **herbinartisans** Stable D9 #distillate #cat2



 **herbinartisans** BCSP ready to go #herbinartisans #klearkrew #flower #mmj #seattle



 **herbinartisans** Cookies coming out 🖤#GSC #seattle #420 #710 #herbinartisans #klearkrew #heady.watr

AFFIDAVIT OF SA MORALES - 6
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

17.     Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "shatter," "oil," "clear," and marijuana buds.

18.     In addition to posting photographs of marijuana distillates and extracts, KENNETH W. RHULE used the HerbinArtisans Instagram page to send and receive direct messages— private communications—with others regarding HerbinArtisans' products.  For example, the following communications were sent to and from the HerbinArtisans Instagram account:

a.     On June 18, 2019, coastisclearnj messaged HerbinArtisans "You guys have any d9 liters in the 6-6.5 range?  Crypto ready."

b.     On May 13, 2019, solteksolutions messaged HerbinArtisans "Can you contact me in regards to bulk shatter and distillate orders?  I need 6 lb of shatter currently and 1L of clear distillate."

c.     On March 12, 2019, erikkve messaged HerbinArtisans "Warm greetings to you and your crew! . . . I'd like to inquire about a small order of raw distillate (for edible or dab use) . . . I've already sent my WA state medical card."  In response, HerbinArtisans directed erikkve to communicate via encrypted messaging service Wickr.

19.     Based on my review of the Instagram direct messages, HerbinArtisans would often tell prospective clients to switch over to encrypted messaging services like Wickr and Signal to continue negotiations for product sales.  For example, on July 14, 2017, northwest_dabber sent a message to HerbinArtisans, stating "I Need a ticket on distillate gram syringes bulk and best quality nug run slabs or good white plant/trim runs."  In response, HerbinArtisans asked "You have signal" and provided a telephone number associated with KENNETH W. RHULE.

20.     When selling marijuana extracts and distillates, HerbinArtisans accepted cash and cryptocurrency.  For example, on January 6, 2018, chevy_710 messaged HerbinArtisans asking "Price in distillate?"  HerbinArtisans responded "I only accept cryptos, local for cash."  Additionally, on February 21, 2018, dankables sent a message to

AFFIDAVIT OF SA MORALES - 7
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

HerbinArtisans stating "Hey homie was wondering whats good on wholesale distillate, were looking to launch a cart line real soon just need a solid source for our distillate." In response, HerbinArtisans asked "Okay would you buy local to Wa or crypto?" On March 14, 2018, HerbinArtisans told another potential purchaser, fatboy.305, "Future reference crypto is the only means of accepting payment."

**B. Search of HerbinArtisans Production Facility**

21.     Since August 2016, HerbinArtisans has been extracting and distilling these marijuana products at a property located at 29428 181st Street SE, Monroe, Washington, which is also assigned the address 29209 Cedar Ponds Road, Monroe, Washington. On March 10, 2020, agents searched this location, along with others, pursuant to warrants.

22.     On March 10, 2020, RHULE was living at the Monroe Property, and was present when law enforcement agents executed the search warrants.

31.     As described below, during these searches, agents located bulk marijuana, marijuana distillates, and drug paraphernalia, among other items. When agents searched the property they found the following:

a.       Inside a warehouse, agents found processing equipment and materials dedicated to the extraction and concentration of marijuana including: various types of industrial-grade machinery, steel tables, industrial amounts of dry ice, dry-ice storage bin coolers, metal cylinders of various sizes, flexible metal hoses, pressure cylinders, various pumps, industrial scales, stainless steel pressure cylinders, pressure covers, vacuum pumps, electric motors, a mini dryer, a terpene trap, tube racks, mixers, chemistry mixers, multiple ovens and drying racks containing marijuana distillate products.

b.       Inside the warehouse, agents also found associated materials and equipment, including a label maker, bins, buckets, industrial fans, multiple industrial sized pressurized gas tanks, a shop-vac, heavy-duty dollies, ladders, welding equipment, industrial amounts of "monodisperse silica gel," "aromatizing clay," large quantities of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  mylar bags, multiple jars and lids, rubber gloves, and other items used to manufacture
2  and produce controlled substances.

3        c.    Inside the warehouse, agents also found approximately 29 large
4  garbage bags filled with marijuana plant material and multiple glass jars containing
5  refined marijuana distillate products.  Agents further found a large rotary evaporator with
6  multiple large glass flasks, a heavy-duty press, and a 50-gallon tank of pressurized
7  butane.

8        d.    Agents found numerous pre-printed documents headlined
9  "Hydrocarbon Inventory Process worksheet" throughout the warehouse which detailed
10  the weight and results of the extraction process.  These pre-printed worksheets were
11  completed with handwritten notes from various individuals whose identities have not
12  been verified.  Fields on the work sheet include: "Date" and "Assembly" (often filled out
13  with a name or left blank).  Each worksheet contained information for four "columns"
14  (steel cylinders used to extract THC) with a "weight" and "strain" field for each column.
15  Three fields for "Wet Weight," "Dry Weight," and "Slab Count" were present.

16        e.    Between the residence, where RHULE was residing at the time, and
17  the warehouse, investigators located a tent containing:  (1) six 50-gallon drums of "N-
18  Heptane," a highly flammable alcohol used in the marijuana distillate extraction process;
19  and (2) three assault rifles with loaded magazines.  Next to the tent, investigators found a
20  white 2008 Dodge Sprinter transport van.  An extension cord running from a nearby shed
21  into the front passenger side of the van was plugged into an electric air purifier which
22  rested on the dashboard.  Numerous small air-fresheners were scattered around the van.
23  Modifications had been made to block the ventilation system along the front wall of the
24  separate rear cargo transport area.  Investigators believe that this cargo van was used to
25  transport unprocessed marijuana plants for the production and manufacturing of
26  marijuana distillate products.

27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

f.      In total, agents found approximately 1,000 kilograms of bulk marijuana or marijuana extracts, with packaging, when they executed search warrants in connection with this case in March 2020.

**C. RHULE's Role in HerbinArtisans**

23.     As described herein, RHULE is one of the primary operators of HerbinArtisans, making the initial capital investment in the company and participating in the manufacture of marijuana products.

24.     RHULE is believed to serve as the Chief Executive Officer of HerbinArtisans.  According to an organizational chart located on KENNETH W. RHULE's computer, last modified in 2016, "Ken"—believed to be RHULE—was listed as the "CEO," while "Kenny"—a name used by KENNETH W. RHULE—was listed as the "COO" of an organization.  While this organizational chart is not titled, and does not state which organization it describes, it is believed to be an organizational chart for HerbinArtisans.  Notably, other individuals, also associated with HerbinArtisans, were listed in subordinate roles with the titles "Garden technician," "Processing lead," "Processor," and "VP" on this chart, including C.E., described in further detail below.

25.     In operating HerbinArtisans, RHULE used the cloud-based accounting software, Xero, to record HerbinArtisans' profits, expenses, invoices, and other data. According to an Income Statement saved in this account, from 2015 until 2019, HerbinArtisans earned a "Total [Gross] Income" of $13,710,069.27 and a "Net Income" of $2,5774,850.33.

26.     The Xero data also indicates that RHULE is a part owner or operator of HerbinArtisans.

a.      According to Xero, "Ken R," using the email address krhule@icloud.com was listed as an active user for the account, with the following roles: "Financial Adviser; Standard; Manage Users; Payroll Administration; Subscriber; Bank Account Admin."  RHULE, using this account, was also listed as the primary

1   "Subscriber" for the Xero account, while all other individuals were listed as "Invited
2   User[s]."

3                b.     RHULE logged into Xero and updated HerbinArtisans' records,
4   using the username krhule@icloud.com, over 200 times from August 2015 until
5   December 2019.

6                c.     RHULE's counsel has claimed that RHULE provided his Xero login
7   credentials to be used by his son, KENNETH W. RHULE, and another HerbinArtisans
8   employee.  However, at least a portion of these logins were completed using Internet
9   Protocol ("IP") addresses that RHULE also used to access his Apple account,
10  cryptocurrency account, or email account.  For example, on May 16, 2019, RHULE's
11  Xero account was accessed using the IP address 193.37.254.27.  According to public
12  databases, this IP address is associated with a Virtual Private Network ("VPN"), used to
13  encrypt communications and mask IP addresses.  Once accessed from this IP address,
14  RHULE's Xero account was used to complete more than 100 transactions, a portion of
15  which are depicted in the chart below.

| _messagetime | ac_username | ac_ip | p_act | cs_raw_url |
|---|---|---|---|---|
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/engage |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | GET | /apiv2/Organisations/!7lXmq |
| 5/16/2019 21:23 | krhule@icloud.com | 193.37.254.27 | GET | /apiv2/analytics/decide |
| 5/16/2019 21:21 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |
| 5/16/2019 21:21 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/engage |
| 5/16/2019 21:20 | krhule@icloud.com | 193.37.254.27 | POST | /apiv2/analytics/track |

        RHULE used this same IP address to access his Apple account, including on May
16, 2019.  For example, RHULE used this IP address to complete two iTunes
transactions, including downloading the encrypted chat application, Wickr, onto his
iPhone.

| create_ts | email_addr_txt | first_n | last_ | street_1_name | city_name | sta | ar | phone | ip_addr_tx | provider_nam |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018-10-10 03:54:26 | kenrhule@outlook.com | kenneth | rhule | 19025 163rd ct ne | Woodinville | WA | 360 | 9137158 | 193.37.254.27 | Whitepages.com |
| 2019-05-16 16:15:45 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 | 7702759 | 193.37.254.27 | Wickr, LLC |

RHULE also used this IP address to update his iTunes account over 60 times, including, on May 16, 2019, updating applications for his cryptocurrency wallets, his financial accounts, and his encrypted email account.



| create_ts | email_addr_txt | fir | last | street_1_nam | city_r | st | phon | ip_addr_tx | content_name | platform |
|---|---|---|---|---|---|---|---|---|---|---|
| 2019-05-16 23:28:16 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | SunTrust Mobile App | iPhone |
| 2019-05-16 23:28:18 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | Bitpie Blockchain Wallet | iPhone |
| 2019-05-16 23:28:20 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | Cake Wallet for XMR Monero | iPhone |
| 2019-05-16 23:28:21 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | EasyMeasure | iPhone |
| 2019-05-16 23:28:26 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | ProtonMail - Encrypted Email | iPhone |
| 2019-05-16 23:28:33 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | Monero Wallet by Freewallet | iPhone |
| 2019-05-16 23:28:35 | kenrhule@outlook.com | ken | rhule | 29428 181st St se | Monroe | WA | 425 7702759 | 193.37.254.27 | Revolut - Radically Better | iPhone |

Furthermore, RHULE used this IP address to login to his Apple account on 170 occasions (from August 2018 through May 2019), and to access his iCloud account over 300 times (in June 2019).  Finally, RHULE used this IP address to access his Gemini cryptocurrency account on January 16, 2020, as shown below.



| User Sessions Created Date | User Sessions IP | User Se | User Sessions Browser |
|---|---|---|---|
| 2020-01-16 | 193.37.254.27 | iPhone | Gemini Mobile |

     d.     Additionally, according to statements saved in the account, from August 2015 until April 2017, HerbinArtisans issued more than $25,000 in payments to "Kenneth Rhule," "Ken R," or "Ken Rhule."

     e.     From December 2015 until May 2018, "Kenneth J" also received more than $150,000 in payments from HerbinArtisans for, among other things, payroll, expense reimbursement, and loan repayments.  Notably, these payments were often made in Bitcoin.

     27.     In operating HerbinArtisans, RHULE communicated with others, including KENNETH W. RHULE, regarding the company and its marijuana products.   For example, law enforcement located text messages exchanged with RHULE[1] in an

---

[1] In these text communications, RHULE used the telephone number 425-770-2759, which, as described in further detail below, has also been used by RHULE when opening financial accounts.

AFFIDAVIT OF SA MORALES - 12
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  iMessage archive, saved on KENNETH W. RHULE's computer, searched pursuant to a

2  warrant.

3          a.     In these text messages, RHULE described his investment in

4  HerbinArtisans.  For example, on March 30, 2015, RHULE sent the following text

5  message to KENNETH W. RHULE:

> Let's talk in person... I don't wanna say something out of frustration.  I've
> got well over 6 figures into this, and I've received a grand total of $425
> from a QP on the first aero trial run.  I have been totally flexible as you've
> drawn living costs, and lent funds to [M].  I'm not sure what the issue is,
> although you can't quit whenever somethjng gets stressful.  It takes a lot of
> time to get somethjng off the ground, and requires patience.  The damn
> construction isn't even done yet.  Things get much smoother when it seen
> through.  This op at the warehouse is 95% done.  It's setup to generate
> 2535lbs per room every 60 days (which is 2535 lbs once per month out of
> alternating rooms) that is $5070k per month, plus the trim that it yields.
> That, along with supplemental oil to keep the system running is another
> 2535k per month.  That can be run smoothly with just [C and M2] (or 2
> employees ).  That's roughly 100k per month in revenue with costs of less
> that 18k per month... That leaves uswith 80k per month for you and I.
> When the construction is finished, that output becomes a walk in the park.
> As the employees get familiar with the systems, they dial them in further
> and can do it in their sleep.  It doesn't need to be stessful. It doesn't need
> [M], end user sales, etc.  Simply moving volume wholesale to a small
> handful of people.  After the setup is done, this whole thing can operate
> with A couple of people, it really won't be that involved.  It's time
> consuming because it involved construction and learning the industry.
> Both of those variables are nearly complete now.  Anyhow ... Let's talk so I
> can better understand.

        b.     Similarly, on April 21, 2015, RHULE sent the following message to

KENNETH W. RHULE, which stated, in part:

> All working capital has come from me, all infrastructure has come from
> me, all tools, equipment, inventory, vehicles, etc. have come from me, the
> building rent and utilities are paid by me, and he is still having a hard time
> cash flowing... Like I told [J] day 1... You need to model the business
> around a dead minimum of $200k per month in revenues, otherwise the
> baseline expenses will be too high to make any worthwhile profits...

AFFIDAVIT OF SA MORALES - 13
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      c.      In these text communications, RHULE also discussed selling

2  HerbinArtisans' product, including on the dark web.  For example, on April 24, 2015,

3  RHULE sent the following message to KENNETH W. RHULE, which stated, in part:

4  "[M] sold another grand worth today roughly.  Also, I have some KILLER deep web

5  locations for selling . . ."

6      d.      Similarly, on April 25 ,2015, RHULE sent the following message to

7  KENNETH W. RHULE, which stated: "I wanted to show you the dark sites… I'll make

8  you a bootable anonymous browser."

9      e.      On May 5, 2015, RHULE sent KENNETH W. RHULE a

10  photograph of a white board, which had the following text, among others written on it:

11  "Our core competency is: The production & sales of Marijuana Products!"  Along with

12  this photograph, RHULE sent the text "FYI posted in concentrate room…"

13      f.      On November 12, 2015, RHULE sent the following message to

14  KENNETH W. RHULE, which stated, in part:  "I am putting out more ad's with better

15  keywords... There ads don't pop up with all the keywords, and are pretty basic... I'm

16  jazzing them ups bit and making them more visible, but wanted to set prices to be able to

17  hand it off to them where they make a reasonable profit built in..."

18      g.      On October 6, 2014, RHULE also texted KENNETH W. RHULE:

19  Ok, stay till Wednesday, your already making the trip, what's another day?
20  But try to get back Wednesday, Thursday latest so we can take the next
    step... It's time to get the 3 rooms automated, meaning float switches that
21  keep reservoirs topped off, dosage pumps that keep nuts and ph dialed in ,
    etc. the aero works flawless now... Shit is so much less stress. Getting to be
22  more enjoyable not as much engineer and build, more gardening….

23

24  Based on my training and experience, and other information learned during the course of

25  this investigation, I recognize the above text as discussing a marijuana grow operation.

26      28.      Additionally, law enforcement located text messages exchanged with

27  RHULE in KENNETH W. RHULE's Google account, saved in his Google Photos,

28  searched pursuant to a warrant.  For example:

AFFIDAVIT OF SA MORALES - 14
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.    A screenshot of a text message exchanged with "Boss Hoggins"—believed to be RHULE—KENNETH W. RHULE, and C.E. (another HerbinArtisans employee) was saved in KENNETH W. RHULE's Google account.  This text message was last modified on August 20, 2016, and was located a Google photos folder entitled "2015-12-15-16."  In this text message, C.E. stated:

> We have too many hands on the purge process.  We consistency make errors on the assemblies and there is constant confusion.  I think we need to develop a system where 2-3 people max are purging consistently at consistent times, like clockwork.  thoughts?  The little oven got up to 130 under a full vac with no one really keeping an eye on it.  Lots of accidental waxation that could be avoided.

In response, another person, believed to be KENNETH W. RHULE, stated:

> That's pretty much the schedule.  Th blasters will prepare the assemblies in unleashed.  If need be they will scrape and also label the un-purged patties.  The purgers, [E.C] and I.  Start the purging early in the morning.  [C.E.], you and I are the shift leads.  We both need to keep a close eye on these processes, it's the core of our business.  That being said, I'm safe to assume the most logical decision is to have [C.E.] supervise and purge for the 2nd shift.  That means, Dad, don't get involved with the purging unless you speak to one of us.  During our respective shifts. ---- [C.E.] let's get you proficient with the process so you understand all the caveats.  We can also make sure to have another employee trained during the 2nd shift, either as backup, or primary purge master.

Based on my training and experience, I recognize the language above as describing the process of marijuana extraction and distillation.

b.    A second screenshot of a text message, exchanged with "HerbinArtisans"—believed to be KENNETH W. RHULE—RHULE, and other HerbinArtisans employees was saved in KENNETH W. RHULE's Google account.  This text message was last modified on July 10, 2018, and was located a Google photos folder entitled "2016-06-21."  In this text message, KENNETH W. RHULE stated:

> Dad and [C.E.], If no dry ice comes in, please communicate with the team on who needs to be in, pending any tasks you have for them.  We want to productive with who is at the shop if we aren't processing.

AFFIDAVIT OF SA MORALES - 15
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Based on my training and experience, and information gained during the course of this investigation, I know that dry ice is used in extracting and distilling marijuana products.

29.     In addition to exchanging text messages, RHULE also communicated with others, including KENNETH W. RHULE, regarding HerbinArtisans and its marijuana products via email.

a.     For example, on April 28, 2019, RHULE, using krhule@icloud.com, and E.C. were cc'd on an email from B.S to J.B. entitled "intro to the Herbinartisans crew – NOT flying related."   B.S. is affiliated with the Harvey Airfield, where RHULE and KENNETH W. RHULE stored their airplane.  In this email, B.S. stated, in part:

> [J.B.] meet [E.C.] . . . one of (the[?] Herbinartisans production manager).
> As discussed and following my chats with Kenny and Ken Rhule, although
> they do not have an immediate need for staff, they have both expressed a
> willingness to have you come out and see the facility/meet some of the
> team members . . . . as I have spoken to Kenny, Ken, and [E.C.] about
> giving you a look-see around their facility, please coordinate with [E.C.] to
> set up a mutually convenient time to go to their production facility and
> meet some of the crew.

In response, on May 23, 2019, J.B. emailed KENNETH W. RHULE stating, in part, "Thank you for your time and the background on your operations, I liked what I saw and the vision of the business.   I attached my resume that show's where I have been.  To me, my next phase of work is more about where I am going.  Cannabusiness could be it." That same day, KENNETH W. RHULE forwarded this email to RHULE.

b.     RHULE also used krhule@icloud.com to discuss invoicing and recordkeeping for HerbinArtisans.  For example, on December 2, 2015, C.E. emailed RHULE, using krhule@icloud.com, and KENNETH W. RHULE, stating "Hey guys, I took 2 oz of O.G. Kush to settle a personal debt.  I'm not sure how we should enter it into the system."  Based on my training and experience, and information learned during the course of this investigation, I know that O.G. Kush refers to a marijuana product.  That same day, RHULE responded:

Ok, thats a pretty simple transaction… Invoice the 2 ounces out to you at wholesale rate.  When thats done let me know the invoice #, and I will go in to xero and apply payment in full to the invoice, but instead of having you pay that in cash, I will apply the payment to your advances instead.  The net result would be the same as taking an advance for the wholesale price of the oil.

   c.  Additionally, RHULE used this account to discuss obtaining marijuana trim in order to process marijuana distillates and extracts.  For example, on December 4, 2015, RHULE, using krhule@icloud.com, sent an email to KENNETH W. RHULE, forwarding a Craigslist email that said "have lb or 2 i'd like to have processed if you do such jobs.  % to you.  & can trade bud for your products."  Based on my training and experience, and information learned during the course of this investigation, I know that bud refers to marijuana.

## III. Unlicensed Money Transmission

   30.  In addition to manufacturing marijuana distillates and extracts, KENNETH W. RHULE also sold cryptocurrency in exchange for cash.  KENNETH W. RHULE, using an account on localbitcoins.com, advertised in-person cash-for-bitcoin exchanges.  Localbitcoins.com is a website that allows users to post advertisements, listing exchange rates and payment methods for buying and selling bitcoins, including allowing users to connect with bitcoin sellers in their vicinities through in-person meetings where cash is exchanged for bitcoins.

   31.  From April 2018 until December 2018, law enforcement, or a cooperating source working with law enforcement, exchanged more than $140,000 in cash for bitcoin with KENNETH W. RHULE or his designee, using the Gimacut93 account.  This account is registered in the name of RHULE's wife, Olga Rhule, using **SUBJECT ACCOUNT 1** as its registered email address.

   32.  For example, in April 2018, HSI SA Judson Scott responded to an advertisement posed by Gimacut93 on the website localbitcoins.com.  The advertisement by Gimacut93 offered to sell bitcoin through an in-person exchange at a "public location

only."  The advertisement indicated that Gimacut93 sold bitcoin at fiat[2] exchange rate, and would accept various forms of payment to include unregistered prepaid Visa or MasterCard cards and "various other gift cards."  A review of the website localbitcoins.com showed that Gimacut93 was an established, and apparently well-known, bitcoin trader with history dating back two years and more than one thousand confirmed trades.  Gimacut93 advertised a trade limit of $5,000 to $100,000.

33.    Based upon messages exchanged via text to the telephone number that Gimacut93 listed on localbitcoins.com—813-506-7673,[3] SA Scott arranged with Gimacut93 to exchange $12,000 for bitcoin.  The parties agreed to conduct the transaction on April 10, 2018, at a Starbucks in Seattle, Washington.

34.    On April 10, 2018, an HSI SA acting in an undercover capacity ("UCA-1"), met with Gimacut93—determined to be KENNETH W. RHULE base upon a review of Washington Department of Licensing records—inside the Starbucks, located in Seattle, Washington.  At the meeting, UCA-1 provided $12,000 to KENNETH W. RHULE. After KENNETH W. RHULE confirmed the amount of U.S. currency tendered by UCA-1, SA Scott texted his bitcoin wallet address to KENNETH W. RHULE's cell phone. Using a wallet application on his phone, RHULE transmitted bitcoin to the wallet designated by a SA Scott.  UCA-1 described SA Scott as his/her "partner."

35.    While waiting for confirmation that the bitcoin was sent to the wallet address provided by SA Scott, KENNETH W. RHULE spoke about his current line of

---

[2] Fiat currency is "sovereign currency" or "real currency, the money of a government." *Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).
[3] This telephone number is used by KENNETH W. RHULE.

AFFIDAVIT OF SA MORALES - 18
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

work within the CBD[4] industry, explaining at one point during the meeting that he was doing "5, 10, or 20,000 kilo" CBD orders.[5]

36.     KENNETH W. RHULE also spoke at length about bitcoin mining and significant events related to the bitcoin industry.  Specifically, he indicated that he and his fraternal twin had previously mined bitcoin.  KENNETH W. RHULE further indicated that his parents had also invested in bitcoin and bitcoin mining.

37.     Notably, in response to UCA-1 indicating that UCA-1's partner was in a cash heavy business, KENNETH W. RHULE stated that bitcoin was only pseudo-anonymous and was "extremely easily tracked."  RHULE then explained that if he needed to "wash" bitcoin, he would convert it to Monero, which is "a 100% anonymous cryptocurrency."

38.     KENNETH W. RHULE did not charge a fee for the transaction but indicated that he had charged a 2-3% fee in the past.  He explained that he had a lot of bitcoin that he needed to "dump" right now, and that was the reason why he did not charge a fee.  KENNETH W. RHULE then explained that he usually had about $100,000 in bitcoin to work with each month, and sometimes more.  Law enforcement is investigating whether this bitcoin is derived from KENNETH W. RHULE and RHULE'S marijuana sales.

39.     During the cash-for-bitcoin transaction on April 10, 2018, and during subsequent exchanges, KENNETH W. RHULE did not ask UCA-1 for any "Know Your

---

[4] Based upon my training and experience, I know that CBD, or cannabidiol, is derived from the stalk and seed of the cannabis plant.  Cannabidiol (CBD) oil or CBD hemp oil is a natural botanical concentrate that is high in the compound CBD.  Of the numerous cannabinoids identified in the cannabis plant, CBD is the second most common after tetrahydrocannabinoil (THC).  As CBD oil is derived from the seeds and stalk of the cannabis plant, it does not contain THC and therefore is non-psychotropic.

[5] In addition to selling CBD, during the course of their communications, RHULE also told UCA-1 that he was involved in installing lifesaving technologies (fire alarms, sprinkler systems), served as a consultant for CBD companies, and was involved in establishing bitcoin ATMs at casinos.

AFFIDAVIT OF SA MORALES - 19
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Customer" information.  Neither KENNETH W. RHULE nor RHULE are registered as a money services business with Financial Crimes Enforcement Network ("FinCEN") or the Washington Department of Financial Institutions ("DFI").

40.     Additionally, on June 20, 2018, SA Scott sent KENNETH W. RHULE a text message requesting another exchange of U.S. currency for bitcoin.  KENNETH W. RHULE agreed to conduct an exchange of $15,000 for bitcoin.  The parties agreed to conduct the transaction on June 22, 2018, at a Starbucks located in Seattle, Washington.

41.     On June 22, 2018, UCA-1 and KENNETH W. RHULE met at the Starbucks.  This meeting was audio and video recorded.  Upon sitting down at the table with UCA-1, KENNETH W. RHULE removed an Apple laptop computer from his bag and turned it on.  KENNETH W. RHULE explained that he brought the computer because he had to convert some Monero to Bitcoin during their meeting.

42.     KENNETH W. RHULE explained to UCA-1 that he had told UCA-1's partner—SA Scott—that he would charge a 4% fee for this transaction, as there was an 8-10% drop in the price of Bitcoin overnight.

43.     UCA-1 handed an envelope to KENNETH W. RHULE with $15,000 in cash.  KENNETH W. RHULE proceeded to hand-count the $15,000.  As with the first two transactions, SA Scott provided KENNETH W. RHULE, via text to KENNETH W. RHULE's cell phone, with the bitcoin wallet address to which the bitcoin would be sent. Using his phone and laptop, KENNETH W. RHULE then transferred the bitcoin to the wallet designated by SA Scott.

44.     While waiting for the transaction to be complete, UCA-1 explained that he/she was dealing with contacts in Ukraine to assist in bringing women to the United States for the purpose of prostitution.  Excerpts of this conversation are included below:

UCA-1:     With changing the business model that I've been operating under . . .
           I don't think we've talked about the business.

KWR:       No.

AFFIDAVIT OF SA MORALES - 20
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

UCA-1:   I'm starting to operate with contacts in the Ukraine to help bring women here. I don't want them to have any idea how to get a hold of me . . . identify me. I want it all very anonymous.

RHULE:   This is the way to go then. Basically he can go on here and this is the wallet which you use and he can click received. He will just have this one receive address that I send it to and this wallet is anonymous, which you use on TAILS. If we're doing a trade like this and you didn't want to bring in a laptop or whatever, we can go search this address on the blockchain right after I do my transaction and you'll see right after when it is confirmed. But this is the way to do it.

KWR:   So from Ukraine cash to bitcoin for dollars, then the dollars can come into this country untaxed. Any foreign investment dollars going to a business is not taxed.

                                        ***

UCA-1:   I don't know much my partner's discussed with you.

KWR:   Nothing.

UCA-1:   OK, so we talked about . . . my girlfriend who is also running girls, she moved into the oil fields of North Dakota. So she is going to send me the cash you the cash. I've got the mailbox now, so can I give you the key.

KWR:   Sure.

UCA-1:   And you would pick up the cash and just send it to her bitcoin.

KWR:   Yes, I can do that.


45.     During this transaction, KENNETH W. RHULE offered UCA-1 advice on how to avoid having the mailed cash seized and altered their plan to ensure greater security. After discussing the above details regarding UCA-1's "new business model" of bringing women from Ukraine, as well as making arrangements regarding UCA-1' s girlfriend that was also "running girls" and would be sending KENNETH W. RHULE cash through the mail to purchase bitcoin, KENNETH W. RHULE proceeded to assist UCA-1 with setting up the TAILS operating system on his/her computer. As with prior

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  transactions, KENNETH W. RHULE did not ask UCA-1 for any "Know Your Customer"
2  information.

3  **IV.    SUBJECT ACCOUNT 1**

4      46.      According to information obtained from Google, **SUBJECT ACCOUNT 1**
5  was created on August 3, 2013, registered in the name of "John K."

6      47.      During the course of this investigation, I have learned that RHULE has
7  used the alias "John Kuhn," or variations thereof.  For example, "Jon Kuhn" was the
8  subscriber listed on the RHULE's ken@herbinartisans.com account.  On January 10,
9  2016, RHULE emailed his son, KENNETH W. RHULE, from ken@herbinartisans.com,
10 stating "my name is stuck as john juhn on this… not sure how that happened, I may have
11 been logged into a stealth account when I first logged on.  I cant change my name, are
12 you able to?"

13     48.      RHULE used **SUBJECT ACCOUNT 1** to incorporate Frontline LLC, a
14 shell company that he used to purchase the property located at 29428 181st Street SE,
15 Monroe, Washington.  In March 2016, RHULE incorporated Frontline LLC in Delaware
16 using a registered agent, Harvard Business Services.  RHULE used **SUBJECT**
17 **ACCOUNT 1** when communicating with Harvard Business Services, exchanging emails
18 regarding the incorporation process and obtaining a taxpayer EIN.  According to header
19 information obtained from Google, RHULE sent approximately fifteen emails to
20 addresses containing the domain @delawareinc.com.  Based on by training and
21 experience, and information learned during the course of this investigation, I know that
22 domain is associated with Harvard Business Services, Inc.

23     49.      Additionally, RHULE used **SUBJECT ACCOUNT 1** to communicate
24 regarding various financial accounts, including those held at Bitcoins of America,
25 Coinbase, Stripe, Green Dot, and localbitcoins.com.  For example, **SUBJECT**
26 **ACCOUNT 1** is listed as the email address for the user Gimacut93 at localbitcoins.com.

27

28

According to header information obtained from Google, from June 2016 through January 2020 **SUBJECT ACCOUNT 1** received more than 15,000 emails from email addresses using the domain @localbitcoins.com.

## V.   SUBJECT ACCOUNT 2

50.   According to information obtained from Microsoft, **SUBJECT ACCOUNT 2** was created on December 29, 2015, registered in the name of "Ken R."

51.   RHULE used **SUBJECT ACCOUNT 2** to communicate regarding various financial accounts, including with Square, PayPal, Zions Bank and Bofi Federal Bank, and the cryptocurrency exchanges Kraken, Bitpanda, Cex.io, Coinbase, Gemini, and Coinmama.  For example, on March 2, 2020, RHULE sent an email to "Kraken Support."

52.   RHULE also used **SUBJECT ACCOUNT 2** to communicate with individuals on Craigslist.  For example, on July 31, 2018, RHULE received an email from Craigslist, which appears to be in response to a Craigslist ad.  On this same date, RHULE sent an email to "craigslist 6652454082," which appears to be affiliated with a Craigslist ad.  As described above, RHULE communicated with his son regarding selling marijuana products on Craigslist.

53.   RHULE also used **SUBJECT ACCOUNT 2** to communicate regarding home or building supplies, including with Tractor Supply Company and the Home Depot.

54.   Finally, RHULE used **SUBJECT ACCOUNT 2** in conjunction with the company he opened, RKK Associates LLC.  When incorporating this company, RHULE used the alias "John Kuhn."  In registering this company, RHULE listed a postal box in Grandville, Michigan, as RKK Associates LLC's principal place of business.  RHULE used RKK Associates to register to register a van and a truck—used to transport bulk marijuana and marijuana products, as described above.  RHULE used this account to use FreshBooks, cloud-based accounting software for RKK Associates LLC.  For example, on April 18, 2016, Freshbooks sent an email to **SUBJECT ACCOUNT 2**, noting "to voice your invoice from RKK Associates LLC for 500.00 . . . click the link below."

AFFIDAVIT OF SA MORALES - 23
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## BACKGROUND CONCERNING ONLINE ACCOUNTS

55.     As explained herein, information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

56.     In my training and experience, the information stored in connection with an online account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

57.     Further, information maintained by the online provider can show how and when and where the account was accessed or used.  For example, as described below, online providers typically log the Internet Protocol (IP) addresses from which users access an account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).

58.     Stored electronic data may provide relevant insight into the online account owner's state of mind as it relates to the offense under investigation.  For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

AFFIDAVIT OF SA MORALES - 24
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## 2.  Google's Services

59.     In my training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access and instant messaging (otherwise known as "chat" messaging), to the general public.  Google provides subscribers email and chat accounts at the domain name "@gmail.com." Google also allows subscribers to register a custom domain name and set up Google services such as chat and email using that domain name instead of "@gmail.com."

### A. Subscriber Records and Account Content

60.     Subscribers obtain an account by registering with Google.  When doing so, email providers like Google ask the subscriber to provide certain personal identifying information.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users, and to help establish who has dominion and control over the account.

61.     Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's websites), and other log files that reflect usage of the account.  In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

62.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

63.     In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email.  When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Google servers, and then transmitted to its end destination.  Google often maintains a copy of received and sent emails.  Unless the sender specifically deletes an email from the Google server, the email can remain on the system indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for some period of time.

64.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email.  If an email user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

65.     In addition to email and chat, Google offers subscribers numerous other services including:  Android, Blogger, Google Alerts, Google Calendar, Google Chrome Sync, Google Cloud Print, G-Suite, Google Developers Console, Google Drive, Google Hangouts, Google Maps, Google Payments, Google Photos, Google Search Console, Google Voice, Google+, Google Profile, Location History, Web & Activity, Search, and YouTube, among others.  Thus, a subscriber to a Google account can also store files, including address books, contact lists, calendar data, photographs and other files, on

AFFIDAVIT OF SA MORALES - 26
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    servers maintained and/or owned by Google.  For example, Google Calendar is a

2    calendar service that users may utilize to organize their schedule and share events with

3    others.  Google Drive may be used to store data and documents, including spreadsheets,

4    written documents (such as Word or Word Perfect) and other documents.  Google Photos

5    can be used to create photo albums, store photographs, and share photographs with others

6    and "You Tube," allows users to view, store and share videos.  Google Search Console

7    records a Google account user's search queries.  And Google Web & Activity saves a

8    user's activity on Google sites and apps, including associated info like location, to

9    provide the user with faster searches, better recommendations, and more personalized

10   experiences in Maps, Search and other Google services.  Like many internet service

11   companies (including the companies discussed below), the services Google offers are

12   constantly changing and evolving.

13          66.     Based upon my training and experience, all of these types of information

14   may be evidence of crimes under investigation.  Stored communications, documents, and

15   Google account activity not only may contain evidence of the crimes, but also help

16   identify the participants in those crimes.  For example, address books and contact lists

17   may help identify both the owner of the account and locate co-conspirators, including

18   suppliers and employees of HerbinArtisans.  Similarly, photographs and videos stored in

19   the account may contain substantive evidence of the crimes under investigation, including

20   photographs of marijuana distillates and extracts, bulk marijuana, cryptocurrency

21   addresses, or extraction equipment.  Documents may identify the scope of the criminal

22   activity, including records of HerbinArtisans' business activities and accounting records.

23   And calendar data may reveal the timing and extent of criminal activity.  Search and

24   browsing history can also be useful in identifying those using anonymous online accounts

25   and may also constitute direct evidence of the crimes under investigation to the extent the

26   browsing history or search history might include searches and browsing history related to

27   marijuana products, cryptocurrency transactions, and other evidence of the crimes under

28   investigation or indications of the true identity of the account user(s).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## 2. Microsoft's Services

2     67.     Microsoft is an internet service provider that offers a variety of online

3  services including email accounts (Outlook.com or Hotmail), cloud computing

4  (Microsoft OneDrive, Office and Office365), gaming services (Xbox), video

5  conferencing (Skype), web browsing and search tools (Bing Search, Microsoft Edge, and

6  Internet Explorer), maps, an online marketplace (Microsoft Store), and other services.

7  Microsoft also provides remote computing services for devices that use Windows

8  operating systems, including security services and parental control services which collect

9  information about the use of the devices (e.g., internet browsing history, software usage

10  history, and other information).

11     68.     A Microsoft account (formerly known as a Windows Live account) is what

12  Microsoft customers may use to sign into Microsoft services such as Outlook.com (or

13  Hotmail), Office, OneDrive, Skype, Xbox, Windows, and more.  A user may create a

14  Microsoft account with any email address (Microsoft accounts are not limited to those

15  who use Microsoft email accounts) and a password and thereafter use that email address

16  and password to sign in to any Microsoft program or service.

17     69.     In my training and experience email providers like Microsoft typically

18  retain certain transactional information about the creation and use of each account on

19  their systems.  This information can include the date on which the account was created,

20  the length of service, records of log-in (i.e., session) times and durations, the types of

21  service utilized, the status of the account (including whether the account is inactive or

22  closed), the methods used to connect to the account (such as logging into the account via

23  a website), and other log files that reflect usage of the account.  In addition, email

24  providers often have records of the IP address used to register the account and the IP

25  addresses associated with particular logins to the account.  Because every device that

26  connects to the Internet must use an IP address, IP address information can help to

27  identify which computers or other devices were used to access the email account, which

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  can help establish the individual or individuals who had dominion and control over the

2  account

3      70.    In general, an email that is sent to a Microsoft subscriber is stored in the

4  subscriber's "mail box" on Microsoft's servers until the subscriber deletes the email.  If

5  the subscriber does not delete the message, the message can remain on Microsoft's

6  servers indefinitely.  Even if the subscriber deletes the email, it may continue to be

7  available on Microsoft's servers for a certain period of time.

8      71.    When the subscriber sends an email, it is initiated at the user's computer,

9  transferred via the Internet to Microsoft's servers, and then transmitted to its end

10 destination.  Microsoft often maintains a copy of the email sent.  Unless the sender of the

11 email specifically deletes the email from Microsoft's server, the email can remain on the

12 system indefinitely.  Even if the sender deletes the email, it may continue to be available

13 on Microsoft's servers for a certain period of time.

14     72.    A sent or received email typically includes the content of the message,

15 source and destination addresses, the date and time at which the email was sent, and the

16 size and length of the email.  If an email user writes a draft message but does not send it,

17 that message may also be saved by Microsoft but may not include all of these categories

18 of data.

19     73.    Microsoft provides a variety of online, or "cloud," services in addition to

20 email access, to the public and to customers who utilize Hotmail accounts that are served

21 by Microsoft.  Microsoft's various cloud services are associated with a single Microsoft

22 account, which is typically associated with a Microsoft email address, but can be

23 associated with any email address.  The various cloud services provided by Microsoft are

24 optional and can be turned "on" or "off" by the user.

25     74.    In providing services such as Outlook, OneDrive, Xbox, calendar services,

26 online file storage, storage of browsing history, storage of search history, and locations

27 history, Microsoft collects information that constitute evidence of the crimes under

28

AFFIDAVIT OF SA MORALES - 29
USAO #2018R00575

investigation.  For example, such evidence can be used to discover or confirm the identity and location users of the service at a particular time.

## COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

75.     As a result of my training and experience, and based on my consultation with other agents and law enforcement officers, I have an understanding of the manner in which narcotics are distributed and the various roles played by individuals and groups in their distribution.  I have become familiar with various tools, methods, trends, paraphernalia and related articles utilized by various traffickers in their efforts to import, conceal and distribute controlled substances.  I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations.  I am also familiar with the manner in which drug traffickers will use weapons to protect their drug activities and further its goals.

76.     Based upon my training, experience, and conversations with other experienced officers and agents, I know that:

a.     It is common for drug dealers to use cellular phones subscribed to in a name other than their own.  It is also common for drug dealers to use "pre-paid" cellular phones for which no real subscriber information is available.

b.     During the execution of search warrants at the residences of drug dealers, it is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of vehicles, residences, and/or storage units.

c.     It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal these items from law enforcement authorities.

AFFIDAVIT OF SA MORALES - 30
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.     Narcotics traffickers often maintain books, records, receipts, notes, ledgers, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.

e.     Narcotics traffickers sometimes "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, ledgers, commonly known as "pay and owe sheets," are maintained where the traffickers have ready access to them. Increasingly, sophisticated DTO's maintain these records electronically, either on computers or on cell phones or so-called "smart phones."

f.     Traffickers of controlled substances commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their clients and associates in the trafficking organization. Again, sophisticated DTO's maintain these records electronically, either on computers or on cell phones or so-called "smart phones."

g.     Persons involved in drug trafficking conceal in their residences caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions as well as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities.

h.     Drug traffickers amass large proceeds from the sale of drugs and that they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize domestic banks and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, letter of credit, brokerage houses, real estate, shell operations, and business fronts. Persons involved in drug trafficking and or money laundering keep papers relating to these activities for future reference.

i.     Drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies.

j.     Since the Government's efforts at seizing and forfeiting drug related assets have been widely publicized in the news media and by word of mouth, I know that

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

drug traffickers often place assets in names other than their own to avoid detection of these assets by government agencies.  Even though these assets are in other person's names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

k.      In my experience, and the experience of the law enforcement agents with whom I associate, and as has been recognized in Court decisions, unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

l.      Evidence relating to ownership and interest in real property is often located at the residences, businesses and banks of traffickers.

m.      Drug traffickers take, or cause to be taken, photographs of themselves, their associates, their property, and their product.  These traffickers usually maintain these photographs in their possession.

n.      Narcotic traffickers who distribute controlled substances must maintain on hand amounts of U.S. currency in order to maintain and finance their on-going narcotics business.  Traffickers commonly deal in currency because of its untraceable nature, and also convert their illicit currency into currency equivalents such as cashier's checks and money orders.

o.      Traffickers utilize cell phones, smart phones, Blackberry devices, text messages and/or email devices for ready access to their clientele for the purpose of maintaining their drug related business, and to store customer and supplier names and contact information.

p.      Drug traffickers commonly have in their possession, on their person, and at their residences, and/or in their vehicles and storage units, firearms, and other weapons which are used to protect and secure a drug trafficker's property.  Such property may include, but is not limited to, controlled substances, paraphernalia for the use or sale of controlled substances, books, records, jewelry, and U.S. currency.

AFFIDAVIT OF SA MORALES - 32
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      q.      Based on my experience, evidence of drug trafficking, such as the

2  items described above, is likely to be found where the drug dealers reside, in their

3  vehicles, and in their storage units, despite the lack of direct evidence of criminal activity

4  at the residence or the passage of several months since the last reported activity.

5      r.      I know that marijuana is a controlled substance.  In my experience

6  and the experience of the law enforcement agents with whom I associate, the illegal

7  distribution of controlled substances is frequently a continuing activity over months and

8  years.

9      s.      Persons involved in the trafficking of controlled substances typically

10  will obtain and distribute drugs on a regular basis, much as a distributor of a legal

11  commodity would purchase stock for sale.  Similarly, such drug traffickers will maintain

12  an "inventory," which will fluctuate in size depending upon the demand for and the

13  available supply of the product.

14      t.      In my experience and the experience of the law enforcement agents

15  with whom I associate, drug traffickers keep records of their illegal activities also for a

16  period of time extending beyond the time during which the trafficker actually

17  possesses/controls illegal controlled substances, in order to maintain contact with

18  criminal associates for future transactions and so that the trafficker can have records of

19  prior transactions for which the trafficker might still be owed money or might owe

20  someone else money.

21      u.      The aforementioned items are often maintained by the drug

22  trafficker in secure locations within the premises under their dominion and control, in

23  their vehicles, storage units, residences, and/or on their person, not only for ready access,

24  but also to prevent them from being stolen by other drug dealers and to conceal them

25  from law enforcement.  These items are often concealed on property in/and around the

26  trafficker's residences, in order to conceal the illicit items from law enforcement, should

27  a search by law enforcement at the location occur.

28

AFFIDAVIT OF SA MORALES - 33
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     v.     Additionally, I know that drug dealers sometimes attempt to insulate

2   themselves from detection by law enforcement by utilizing separate addresses from their

3   actual residence to store illegal narcotics and currency derivative of the narcotics trade.

4   ## BACKGROUND ON CRYPTOCURRENCY

5     77.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer,

6   network-based medium of value or exchange that may be used as a substitute for fiat

7   currency to buy goods or services or exchanged for fiat currency or other

8   cryptocurrencies.  Cryptocurrency can exist digitally on the Internet, in an electronic

9   storage device, or in cloud-based servers.  Although not usually stored in any physical

10  form, public and private keys (described below) used to transfer cryptocurrency from one

11  person or place to another can be printed or written on a piece of paper or other tangible

12  object.  Cryptocurrency can be exchanged directly person to person, through a

13  cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is

14  not issued by any government, bank, or company; it is instead generated and controlled

15  through computer software operating on a decentralized peer-to-peer network.  Most

16  cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the

17  decentralized network, containing an immutable and historical record of every

18  transaction.[6]   Cryptocurrency is not illegal in the United States.

19    78.     Bitcoin[7] is a type of cryptocurrency.  Payments or transfers of value made

20  with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any

21  single administrator or entity.  As mentioned above, individuals can acquire bitcoins

22  through exchanges (i.e., online companies which allow individuals to purchase or sell

23  cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin

24  _____

25  [6] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to
    obfuscate transactions, making it difficult to trace or attribute transactions.

26  [7] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice

27  is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and
    community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the

28  cryptocurrency.  That practice is adopted here.

AFFIDAVIT OF SA MORALES - 34
USAO #2018R00575

ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.  Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.

79.     Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it is not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

80.     Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public key and the private key.  A public address is represented as a case-sensitive string of letters and numbers.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

81.     Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

82.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including: on a tangible, external device ("hardware wallet"); downloaded on a Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud storage provider ("online wallet"); as a mobile application on a smartphone or tablet ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a Universal Serial Bus ("USB") thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address and a QR code[8] with the public and private key embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).

---

[8] A QR code is a matrix barcode that is a machine-readable optical label.

AFFIDAVIT OF SA MORALES - 36
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

2       83.     Pursuant to Title 18, United States Code, Section 2703(g), this application

3  and affidavit for a search warrant seeks authorization to require Google and Microsoft

4  (collectively, "**THE PROVIDERS**"), and its agents and employees, to assist agents in

5  the execution of this warrant.  Once issued, the search warrant will be presented to **THE**

6  **PROVIDERS** with direction that they identify the account described in Attachments A-1

7  and A-2 to this affidavit, as well as other subscriber and log records associated with the

8  account, as set forth in Section I of Attachments B-1 and B-2 to this affidavit.

9       84.     The search warrant will direct **THE PROVIDERS** to create an exact copy

10  of the specified account and records.

11      85.     I, and/or other law enforcement personnel will thereafter review the copy of

12  the electronically stored data and identify from among that content those items that come

13  within the items identified in Section II to Attachments B-1 and B-2 for seizure.

14      86.     Analyzing the data contained in the forensic copy may require special

15  technical skills, equipment, and software.  It could also be very time-consuming.

16  Searching by keywords, for example, can yield thousands of "hits," each of which must

17  then be reviewed in context by the examiner to determine whether the data is within the

18  scope of the warrant.  Merely finding a relevant "hit" does not end the review process.

19  Keywords used originally need to be modified continuously, based on interim results.

20  Certain file formats, moreover, do not lend themselves to keyword searches, as keywords,

21  search text, and many common email, database and spreadsheet applications do not store

22  data as searchable text.  The data may be saved, instead, in proprietary non-text format.

23  And, as the volume of storage allotted by service providers increases, the time it takes to

24  properly analyze recovered data increases, as well.   Consistent with the foregoing,

25  searching the recovered data for the information subject to seizure pursuant to this

26  warrant may require a range of data analysis techniques and may take weeks or even

27  months.  All forensic analysis of the data will employ only those search protocols and

28

AFFIDAVIT OF SA MORALES - 37
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

methodologies reasonably designed to identify and seize the items identified in Section II of Attachments B-1 and B-2 to the warrant.

87.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of e-mail communications, chat logs and documents, that identify any users of the subject account and e-mails sent or received in temporal proximity to incriminating e-mails that provide context to the incriminating communications.

AFFIDAVIT OF SA MORALES - 38
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

88.     Based on the aforementioned factual information, I request that the Court issue the proposed search warrant.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachments B-1 and B-2 (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

VICTOR MORALES
Special Agent, DEA

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the __26th__ of January, 2021.

HON.  PAULA L. MCCANDLIS
United States Magistrate Judge

AFFIDAVIT OF SA MORALES - 39
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**ATTACHMENT A-1**
**Google Account to be Searched**

2

3       The electronically stored data, information and communications contained in, related

4   to, and associated with, including all preserved data associated with Google account:

5                       **intellivisioninc@gmail.com**

6    (the "Account") that are stored at a premises controlled by Google, LLC, a company that

7   accepts service of legal process at 1600 Amphitheatre Parkway in Mountain View,

8   California.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA MORALES - 1
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

## **ATTACHMENT A-2**
## **Microsoft Account to be Searched**

3

4

5

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Google account:

6

### **kenrhule@outlook.com**

7

8

9

 (the "Account") that are stored at a premises controlled by Microsoft Corporation ("Microsoft"), an email provider headquartered at 1 Microsoft Way, Redmond, Washington 98052.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENTS - 1
USAO #2018R00575

**ATTACHMENT B-1**
**Particular Things to be Seized**

**II.    Information to be disclosed by Google, LLC:**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, LLC ("Google"), regardless of whether such information is located within or outside of the United States, including any data, messages, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), including Google reference number 5137657, submitted on December 4, 2020, Google is required to disclose the following information to the government for each Account or identifier listed in Attachment A-1, from Account inception to the present:

a.      The contents of all emails associated with the Account (from account inception to the present), including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

c.      all contact lists;

1          d.    all Google Calendar content;

2          e.    all Google Search Console content;

3          f.    all Google Web & Activity content;

4          g.    all Google Hangouts content;

5          h.    all account history, including any records of communications

6 between Google and any other person about issues relating to the accounts, such as

7 technical problems, billing inquiries, or complaints from other users about the specified

8 account.  This to include records of contacts between the subscriber and the provider's

9 support services, as well as records of any actions taken by the provider or subscriber in

10 connection with the service.

11          i.    All records or other information regarding the identification of the

12 account, to include full name, physical address, telephone numbers and other identifiers,

13 records of session times and durations, the date on which the account was created, the

14 length of service, the IP address used to register the account, log-in IP addresses

15 associated with session times and dates, account status, alternative email addresses

16 provided during registration, methods of connecting, log files, and means and source of

17 payment (including any credit or bank account number).

18      Google is hereby ordered to disclose the above information to the government

19 within **14 days** of service of this warrant.

20

21 **III.**   **Information to be seized by the government**

22      All information described above in Section I that constitutes fruits, evidence and

23 instrumentalities of violations of Title 21, United States Code, Sections 841 and 846

24 (Conspiring to Manufacture and Distribute Marijuana and Marijuana Distillates) or Title

25 18, United States Code, Sections 1956 (Money Laundering) and 1960 (Operating an

26 Unlicensed Money Transmitting Business) involving KENNETH J. RHULE or

27

28

ATTACHMENTS - 3
USAO #2018R00575

KENNETH W. RHULE since October 2014, for the Account listed in Attachment A-1, information pertaining to the following matters:

a.      The growth, manufacture, distribution, or sale of marijuana and marijuana distillates and extracts;

b.      The owners, operators, employees, locations, assets, and business purpose of the companies HerbinArtisans, Frontline LLC, RKK Associates LLC, or any other businesses associated with KENNETH W. RHULE or KENNETH J. RHULE;

c.      The receipt or conversion of cryptocurrency, including the receipt of cryptocurrency in exchange for marijuana distillates and extracts;

d.      The use of Instagram or Craigslist to advertise or post pictures of marijuana or marijuana distillates and extracts;

e.      Items, records, or information relating to acquiring, maintaining, or using supplies or equipment to manufacture and distribute marijuana or marijuana distillates and extracts;

f.      Items, records, or information relating to the transfer, purchase, sale, or disposition of cryptocurrency, including on localbitcoins.com;

g.      Items, records, or information concerning the use, creation, or operation of HerbinArtisans;

h.      Items, records, or information concerning communications with individuals regarding the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

i.      Items, records, or information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords, including TAILS passwords and PGP keys;

j.      Items, records, or information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

ATTACHMENTS - 4
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

k.      Items, records, or information concerning advertisements or efforts to sell marijuana products to others;

l.      Any and all applications, documents, records or information regarding applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington;

m.      Items, records, or information relating to the operation of money transmitting businesses, including without limitation, documents and other records relating to the creation or advertisement on websites, cryptocurrency accounts, customer transactions, and communications with others about any of the aforementioned subjects;

n.      Items, records, or information concerning communications with individuals regarding cryptocurrency transactions, localbitcoins.com, or the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

o.      Items, records, or information concerning advertisements on localbitcoins.com, other peer to peer cryptocurrency platforms, or other advertisements or informal offers to sell or buy cryptocurrency;

p.      Items, records, or information reflecting the use of a moniker or handle, including but not limited to Gimacut93, or other online monikers or pseudonyms, reflecting the use of accounts, including those on cryptocurrency marketplaces such as localbitcoins.com, and communications or writings reflecting patterns or idiosyncrasies associated with those online monikers that may be associated with online chats or communications regarding the offenses under investigation;

q.      Items, records, or information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords, including TAILS passwords and PGP keys;

r.      Items, records, or information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

s.      Items, records, or information concerning advertisements or efforts to sell cryptocurrency to others;

ATTACHMENTS - 5
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

t.     Items, records, or information concerning the identities and contact information (including mailing addresses) of any individuals who have purchased or attempted to purchase cryptocurrency from KENNETH W. RHULE, saved in any form;

u.     Items, records, or information concerning KENNETH W. RHULE's location or travel to sell cryptocurrency;

v.     Any and all applications, documents, records, or information relating to communication with the Financial Crimes Enforcement Network ("FinCEN") or the Washington State Department of Revenue ("DOR"), Division of Banking;

w.     All bank records, checks, credit card bills, account information, storage unit information, safe deposit box information, and other financial records demonstrating KENNETH W. RHULE or KENNETH J. RHULE's assets;

x.     Items, records, or information concerning financial transactions associated with the operations of a marijuana or money transmitting business or the laundering of currency and cryptocurrency, including without limitation, any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers, records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies such as bitcoin, cryptocurrency private keys and recovery seeds, packing material or inserts relating to any transactions with any cash-for-bitcoin exchange, and communications with financial services representatives, co-conspirators, or other third parties about any of the aforementioned subjects;

y.     All copies of income tax returns filed with the Internal Revenue Service ("IRS") or the Washington DOR;

z.     All bank records, checks, credit card bills, account information, storage unit information, safe deposit box information, and other financial records demonstrating RHULE's assets;

aa.     The identity of the person(s) who created or used the Account;

bb.     Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use

and events relating to the crime under investigation and the account subscriber;

cc.   Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

dd.   Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

ee.   Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

ff.   Other log records, including IP address captures, associated with the specified Account;

gg.   Subscriber records associated with the specified Account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, Including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by internet service provider in relation to the account; 6) account log files (login IP address, account activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

hh.   Records of communications between the internet service provider and any person purporting to be the account holder about issues relating to the Account, such as technical problems, billing inquiries, or complaints from other users about the specified Account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications;

ii.   Android identification number, MEID, and cellular telephone number; and

jj.   Information identifying accounts that are linked or associated with the Account.

ATTACHMENTS - 7
USAO #2018R00575

## ATTACHMENT B-2
### Particular Things to be Seized

**IV.**   **Information to be disclosed by Microsoft Corporation:**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Microsoft Corporation ("Microsoft"), regardless of whether such information is located within or outside of the United States, including any data, messages, records, files, logs, or information that has been deleted but is still available to Microsoft, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), including GCC-1583157-V3W4J0, requested on December 22, 2020, Microsoft is required to disclose the following information to the government for each Account or identifier listed in Attachment A-2, from Account inception to the present:

a.      The contents of all emails associated with the Account (from account inception to the present), including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Microsoft in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

c.      all contact lists;

ATTACHMENTS - 8
USAO #2018R00575

1    d.  any Microsoft Chat/Messenger information and/or records, including

2 any Microsoft Chat/Messenger Friends list, time, date, and IP address logs for Chat and

3 Messenger use, and any archived web messenger communications stored on Microsoft

4 servers;

5     e.  any Microsoft Notepad information and/or records;

6     f.  any Microsoft Calendar information and/or records,

7    g.  any Microsoft Groups information and/or records including member

8 lists, e-mail addresses of members, messages, files, calendars, database content, and

9 photographs;

10     h.  any stored documents;

11    i.  All records or other information regarding the identification of the

12 account, to include full name, physical address, telephone numbers and other identifiers,

13 records of session times and durations, the date on which the account was created, the

14 length of service, the IP address used to register the account, log-in IP addresses

15 associated with session times and dates, account status, alternative e-mail addresses

16 provided during registration, methods of connecting, log files, and means and source of

17 payment (including any credit or bank account number);

18     j.  The types of service utilized;

19    k.  All records or other information stored at any time by an individual

20 using the account, including address books, contact and buddy lists, calendar data,

21 pictures, and files;

22     l.  All account history, including any records of communications

23 between Microsoft and any other person about issues relating to the accounts, such as

24 technical problems, billing inquiries, or complaints from other users about the specified

25 account.  This to include records of contacts between the subscriber and the provider's

26 support services, as well as records of any actions taken by the provider or subscriber in

27 connection with the service.

28

ATTACHMENTS - 9
USAO #2018R00575

Microsoft is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

**V.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (Conspiring to Manufacture and Distribute Marijuana and Marijuana Distillates) or Title 18, United States Code, Sections 1956 (Money Laundering) and 1960 (Operating an Unlicensed Money Transmitting Business) involving KENNETH J. RHULE or KENNETH W. RHULE since October 2014, for the Account listed in Attachment A-2, information pertaining to the following matters:

a.    The growth, manufacture, distribution, or sale of marijuana and marijuana distillates and extracts;

b.    The owners, operators, employees, locations, assets, and business purpose of the companies HerbinArtisans, Frontline LLC, RKK Associates LLC, or any other businesses associated with KENNETH W. RHULE or KENNETH J. RHULE;

c.    The receipt or conversion of cryptocurrency, including the receipt of cryptocurrency in exchange for marijuana distillates and extracts;

kk.    The use of Instagram or Craigslist to advertise or post pictures of marijuana or marijuana distillates and extracts;

ll.    Items, records, or information relating to acquiring, maintaining, or using supplies or equipment to manufacture and distribute marijuana or marijuana distillates and extracts;

mm.    Items, records, or information relating to the transfer, purchase, sale, or disposition of cryptocurrency, including on localbitcoins.com;

nn.    Items, records, or information concerning the use, creation, or operation of HerbinArtisans;

ATTACHMENTS - 10
USAO #2018R00575

oo.     Items, records, or information concerning communications with individuals regarding the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

pp.     Items, records, or information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords, including TAILS passwords and PGP keys;

qq.     Items, records, or information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

rr.     Items, records, or information concerning advertisements or efforts to sell marijuana products to others;

ss.     Any and all applications, documents, records or information regarding applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington;

tt.     Items, records, or information relating to the operation of money transmitting businesses, including without limitation, documents and other records relating to the creation or advertisement on websites, cryptocurrency accounts, customer transactions, and communications with others about any of the aforementioned subjects;

uu.     Items, records, or information concerning communications with individuals regarding cryptocurrency transactions, localbitcoins.com, or the growth, manufacture, distribution or sale of marijuana and marijuana distillates and extracts;

vv.     Items, records, or information concerning advertisements on localbitcoins.com, other peer to peer cryptocurrency platforms, or other advertisements or informal offers to sell or buy cryptocurrency;

ww.     Items, records, or information reflecting the use of a moniker or handle, including but not limited to Gimacut93, or other online monikers or pseudonyms, reflecting the use of accounts, including those on cryptocurrency marketplaces such as localbitcoins.com, and communications or writings reflecting patterns or idiosyncrasies associated

ATTACHMENTS - 11
USAO #2018R00575

with those online monikers that may be associated with online chats or communications regarding the offenses under investigation;

xx.   Items, records, or information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords, including TAILS passwords and PGP keys;

yy.   Items, records, or information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

zz.   Items, records, or information concerning advertisements or efforts to sell cryptocurrency to others;

aaa.   Items, records, or information concerning the identities and contact information (including mailing addresses) of any individuals who have purchased or attempted to purchase cryptocurrency from KENNETH W. RHULE, saved in any form;

bbb.   Items, records, or information concerning KENNETH W. RHULE's location or travel to sell cryptocurrency;

ccc.   Any and all applications, documents, records, or information relating to communication with the Financial Crimes Enforcement Network ("FinCEN") or the Washington State Department of Revenue ("DOR"), Division of Banking;

ddd.   All bank records, checks, credit card bills, account information, storage unit information, safe deposit box information, and other financial records demonstrating KENNETH W. RHULE or KENNETH J. RHULE's assets;

eee.   Items, records, or information concerning financial transactions associated with the operations of a marijuana or money transmitting business or the laundering of currency and cryptocurrency, including without limitation, any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers, records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies such as bitcoin, cryptocurrency private keys and recovery seeds, packing material or inserts relating to any transactions with any cash-for-bitcoin exchange, and communications with financial services

representatives, co-conspirators, or other third parties about any of the aforementioned subjects;

fff.    All copies of income tax returns filed with the Internal Revenue Service ("IRS") or the Washington DOR;

ggg.    All bank records, checks, credit card bills, account information, storage unit information, safe deposit box information, and other financial records demonstrating KENNETH W. RHULE's or KENNETH J. RHULE's assets;

hhh.    The identity of the person(s) who created or used the Account;

iii.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

jjj.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

kkk.    Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

lll.    Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

mmm. Other log records, including IP address captures, associated with the specified Account;

nnn.    Subscriber records associated with the specified Account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, Including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by internet service provider in relation to the account; 6) account log files (login IP address, account activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related

ATTACHMENTS - 13
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   accounts;

2
    ooo.   Records of communications between the internet service provider and any
3          person purporting to be the account holder about issues relating to the
4          Account, such as technical problems, billing inquiries, or complaints from
           other users about the specified Account.  This to include records of contacts
5          between the subscriber and the provider's support services, as well as
6          records of any actions taken by the provider or subscriber as a result of the
           communications;
7

8   ppp.   Android identification number, MEID, and cellular telephone number; and

9
    qqq.   Information identifying accounts that are linked or associated with the
10         Account.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENTS - 14
USAO #2018R00575

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Google LLC ("Google"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Google.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b. such records were generated by Google's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                            Signature

ATTACHMENTS - 15
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT<br>TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Microsoft Corporation ("Microsoft"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Microsoft.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

      a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Microsoft, and they were made by Microsoft as a regular practice; and

      b.    such records were generated by Microsoft's electronic process or system that produces an accurate result, to wit:

    1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Microsoft in a manner to ensure that they are true duplicates of the original records; and

    2.    the process or system is regularly verified by Microsoft, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                         Signature

ATTACHMENTS - 16
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970